# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Alexis Veljkovic and Nicholas Dimic, | Case No. 18-cv-2159 (SRN/BRT) |
| Plaintiffs, | |
| v. | |
| Radisson Hospitality, Inc., *a domestic entity doing business in the United States*, | **MEMORANDUM ORDER AND OPINION** |
| Defendant. | |

Robert J. Pavich and John Pavich, Pavich Law Group PC, 30 West Monroe Street, Suite 1310, Chicago, IL 60603, and David M. Cialkowski, Zimmerman Reed LLP, 1100 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Plaintiffs.

Moxila A. Upadhyaya, James D. Baldridge, and Katherine W. Morrone, Venable LLP, 600 Massachusetts Avenue NW, Washington, D.C., 20001, and Barbara P. Berens and Erin K. Fogarty Lisle, Berens & Miller PA, 80 South Eighth Street, Suite 3720, Minneapolis, MN 55402 for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This is a dispute about real property in Belgrade, Serbia, and whether Radisson Hospitality (a Minnesota-based hotel corporation) committed tortious acts with respect to that property. Radisson has moved to dismiss Plaintiffs' suit, arguing that it is effectively identical to a lawsuit that Plaintiffs (unsuccessfully) pursued in the Northern District of Illinois and the Seventh Circuit Court of Appeals a little over a year ago. In that litigation, both the District Court and the Seventh Circuit found that Plaintiffs' claims, which are rooted in decades-old property confiscations by Serbia's former communist government, would be best resolved by a special Serbian tribunal called the "Serbian Restitution

Agency" ("SRA"), and that dismissal was thus appropriate under the equitable doctrine of "forum non conveniens."

After carefully reviewing the record and applicable case law, the Court will dismiss Plaintiffs' claims, too. Specifically, the Court finds that a large part of Plaintiffs' case is barred by res judicata, and, to the extent that Plaintiffs' case is not amenable to a res judicata dismissal, an independent review of the record confirms that dismissal on the basis of forum non conveniens is appropriate in the District of Minnesota, just as it was in the Northern District of Illinois. The Court explains its reasoning at greater length below.

## I.      BACKGROUND

It is well established that, in deciding a motion to dismiss, a court may consider the allegations in the complaint, along with "public records and materials embraced by the complaint, and materials attached to the complaint." *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 764 (8th Cir. 2012) (applying this standard in the context of a motion to dismiss on res judicata grounds). Moreover, when deciding a case on the basis of forum non conveniens, a court may also consider declarations, affidavits, and other documentary materials. *See BP Chem. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 680 (8th Cir. 2002) (approving the district court's consideration of "the parties' proffered affidavits, testimony, and documentary materials . . . in deciding . . . questions of personal jurisdiction and forum non conveniens"); *Polanco v. H.B. Fuller Co.*, 941 F. Supp. 1512, 1514 (D. Minn. 1996) (considering "the pleadings as well as extra-pleading material submitted by both parties" when deciding a motion to dismiss on forum non conveniens grounds); *accord Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127, 130 (2d Cir. 1987) ("Motions to dismiss

for forum non conveniens may be decided on the basis of affidavits."). As such, in describing the background of this case, the Court cites to the whole body of evidence that the parties have presented to the Court.

## A. Factual Background

This case centers around 73,000 square feet of land in downtown Belgrade, Serbia, which Plaintiffs refer to as the "Old Mill property" because of a steam mill that sat upon the property for decades. (*See* Compl. [Doc. No. 1] ¶ 8.) Prior to 1945, an entity entitled the "Vracar Cooperative" owned this property. (*Id.*) The Vracar Cooperative was, in turn, owned (in large part) by Plaintiffs' families, the Veljkovic and Dimic families. (*Id.*) However, in 1947, the communist government of Josep Broz Tito (in what was then called Yugoslavia) declared two members of the Veljkovic family "enemies of the state" for allegedly engaging in commerce with Nazi occupiers during World War II. (*Id.* ¶ 9.) As punishment, Tito's government confiscated "all of" the Veljkovics' "property assets and ownership assets," including the Old Mill property. (*Id.*; *see also* Compl., Ex. 4 [Doc. No. 1-4] ("2009 Serbian Court Ruling") (providing detailed background on the convictions of Vojislav Veljkovic and Stojan Veljkovic).) Decades following that confiscation, in 1995, "corrupt municipal bureaucrats" sold the Old Mill property to a group called the "Koling Company," which was apparently "controlled by cronies of [then-Serbian dictator] Slobodan Milosevic." (Compl. ¶ 13.)

After Milosevic was removed from power in 2000, Vojislav Veljkovic's son (and Stojan Veljkovic's nephew), Bogdan Veljkovic, "returned to Serbia [from the United States, where he was also a citizen] and began to wage a very public battle to reclaim his family's

name and property and ownership interests," including the Old Mill property. (*Id*. ¶ 18; *see also* ¶¶ 35-39 (describing the various public officials, including former U.S. Senator Mark Kirk, that Bogdan Veljkovic enlisted to advocate on his family's behalf).)

Bogdan Veljkovic's efforts were not initially successful. (*See, e.g*., Compl. ¶¶ 17-23.) However, by the mid-2000s the Serbian government began to officially recognize the wrongfulness of its past property confiscations. (*Id*. ¶ 24.) In so doing, the Serbian government attempted to create a restitution system that balanced the reasonable expectations of current property holders with the need to compensate victims of decades-old wrongs. (*See generally* Kovacevic Dec. [Doc. No. 24-3] ¶¶ 19-34.)

As a first step, Serbia passed a "First Rehabilitation Law" in 2005, which allowed an individual affected by the property confiscations (or their heirs) to seek an annulment of the underlying conviction on which the confiscation was based; once this annulment, or "rehabilitation," was received, the 2005 law stated, a forthcoming "special law" would provide for restitution. (*See* Nikolic Supp. Dec. [Doc. No. 29-4] ¶ 7; Kovacevic Dec. ¶¶ 4-5.) A few years after the passage of this law, Bogdan Veljkovic, on behalf of his (now deceased) father and uncle, successfully applied for "rehabilitation." (*See* Kosic Dec. [Doc. No. 24-1] ¶ 2.) That is, on November 13, 2009, Bogdan Veljkovic received a judgment from a regional court in Serbia that "annulled" the 1947 convictions of his father and uncle, as well as "all the legal ramifications of those rulings." (2009 Serbian Court Ruling at 1.)

The effect of this decision is murky. Although Bogdan Veljkovic's Serbian counsel claims (in an unsworn declaration from 2015) that this ruling "restor[ed] the Veljkovic family rights of ownership" in the Old Mill property (*see* Kosic Dec. ¶ 4), the decision says

nothing to that effect on its face, and instead focuses entirely on the history behind the

Veljkovics' 1947 criminal convictions, and why those convictions lacked legal support. (*See*

*generally* 2009 Serbian Court Ruling.) Moreover, two Serbian attorneys specializing in this

area of law attest, under oath and with supporting documentation, that this 2009

"rehabilitation ruling" constituted a mere "prerequisite" to applying for restitution (and/or

restoration of property ownership) from a tribunal called the "Serbian Restitution Agency"

("SRA"), which was created under a "Second Rehabilitation Law" enacted in 2011. (*See*

Nikolic Supp. Dec. ¶¶ 7-16; Kovacevic Dec. ¶¶ 6-17.) As one of these attorneys put it: "A

final and binding decision of the [SRA] determining the right to restitution of property

rendered under the [*Second* Rehabilitation Law] is the *sole means of redress* with respect to

restitution of property which was confiscated on the territory of Serbia and transferred into

national, state, or cooperative property after World War II, and *which decision would then*

*constitute a document suitable for registration of ownership under Serbian law*." (*Id.* ¶ 34

(emphasis added).) This interpretation of the 2009 decision is further buttressed by current

Belgrade land records, which do not state that Bogdan Veljkovic, the Vracar cooperative, or

anyone associated with Plaintiffs currently owns the Old Mill property. (*See* 2015 Belgrade

Land Records [Doc. No. 12-2].)

Unfortunately for Bogdan Veljkovic, though, at the same time he was attempting to

reclaim his ownership rights to the Old Mill property, the property's then-owner (the Koling

Company) was preparing to sell the property to a different private company. Although the

details of this sale are not entirely clear, sometime between 2005 and 2008 the Koling

Company sold the Old Mill property to either a Serbian holding company called "Prigan" or

an Austrian real estate company called "Soravia," so that Soravia/Prigan could "develop a world-class hotel on the extremely valuable and prime real estate on which the Old Mill [was] located." (Compl. ¶¶ 25-29.)[1] Although Bogdan Veljkovic (and his supporters in government) warned these entities against further developing the Old Mill property until the Veljkovic rights in the land had been conclusively determined (Compl. ¶¶ 32-43), in 2009 Soravia/Prigran obtained development financing from the Austrian Erste Bank Group and the European Bank for Reconstruction and Development. (*See* Compl., Ex. 8 [Doc. No. 1-8] ("Soravia Press Release").) Two years later, on October 20, 2011, Prigan entered into an "international management agreement" with a Danish company called "Rezidor Hotels APS" to build a "Radisson Blu" hotel on the Old Mill property. (*See* Compl., Ex. 9 [Doc. No. 1-9] ("Rezidor Management Agreement").) This Agreement described Prigan as the hotel's "owner" and Rezidor APS as the hotel's "operator," and imposed various standards on the hotel's construction. (*Id*. at 5.) For instance, many features of the guest rooms were to be modeled after the "Radisson Blu Hotel" at the Zurich airport in Switzerland. (*Id*. at 12.)

Plaintiffs allege that, not only did Rezidor's involvement with the Old Mill property "deter[] many would be supporters, and discourage[] formerly active supporters, from publicly supporting the Veljkovic family efforts to reclaim the Old Mill property" (Compl. ¶

---

[1]     The Court uses the disjunctive "or" because, on the one hand, the Belgrade land records (and Radisson's Serbian attorneys) state that Prigan owns the land, whereas, on the other hand, Plaintiffs (and a 2008 "share purchase agreement" attached to their complaint) suggest that "Soravia" owns the land. (*Compare* Nikolic Supp. Dec. ¶¶ 13-15 *with* Compl., Ex. 3 [Doc. No. 1-3] ("Soravia Share Purchase Agreement").) However, because this dispute does not materially affect the Court's decision, the Court need not resolve it here.

50), but that decisions concerning this hotel came from *Radisson Hospitality's* "offices in Minnesota," where Radisson is headquartered. (*See, e.g.*, *id.* ¶¶ 45-46, 53-62.) Plaintiffs support this contention by alleging that Rezidor APS is a "wholly owned subsidiary" of Radisson Hospitality. (*Id.* ¶ 45.) However, the Management Agreement was signed and executed in Denmark and Serbia between Rezidor and Prigan (*see* Rezidor Management Agreement at 37), and the "list of professional consultants" attached to the Agreement, including the hotel's "main" designers and contractors, were all either Serbian or German companies. (*Id.* at 41-42.) Further, the November 7, 2011 Rezidor press release announcing the Belgrade hotel only contains references to European employees of Rezidor and Soravia. (*See* Compl., Ex. 10 [Doc. No. 1-10] ("Rezidor Press Release").) More still, Radisson Hospitality's Vice President of Owner Relations and Retention, Judd Wadholm, who works in the company's Minnetonka, Minnesota office, submitted an affidavit confirming that "Radisson Hospitality, Inc. is not the owner, operator, or developer of the Radisson Blu Hotel [in Belgrade]," and that "Radisson Hospitality, Inc.'s mere involvement with the hotel is as a master licensor of the Radisson brand name." (Wadholm Dec. [Doc. No. 12-1] ¶ 4.)

Nonetheless, a few years after Rezidor and Soravia/Prigan began developing this "Radisson Blu" hotel on his family's ancestral land, Bogdan Veljkovic turned to the SRA for a remedy. Specifically, in January 2014, Bogdan and his sister Katarina Veljkovic Beigbeder (a duel French/Serbian citizen currently residing in France) submitted "18 claims for restitution" to the SRA. (*See* Nikolic Dec. [Doc. No. 12-2] ¶ 14; Kovacevic Dec. ¶ 18.) Although it was unlikely that the SRA would return the Old Mill property to the Veljkovics, and/or other former shareholders in the Vracar Cooperative, because of the subsequent

transfers described *supra*, and because of the difficulty in returning land to a (now defunct) corporate entity, the SRA could still provide the "rightful" Old Mill property owners up to 500,000 euros ($565,000) in Serbian government bonds, if it deemed their ownership claim(s) meritorious. (*See generally* Nikolic Dec. ¶¶ 6-16; Kovacevic Dec. ¶¶ 19-34.)

As best the Court can tell, the Veljkovics' 18 claims remain pending before the SRA.

## B. The First Veljkovic Litigation ("*Veljkovic I*")

In 2014 or 2015, though, Bogdan Veljkovic decided that his family should also file a tort suit against Radisson Hospitality and Rezidor APS in United States federal court.[2] Bogdan Veljkovic's theory of the case was that Radisson and Rezidor "conspired" with Prigan and Soravia (and presumably their financiers) to "trespass on" and "convert" land that they should have known was not theirs (based on the 2009 Serbian Court Ruling and Bogdan's public advocacy), and that the companies should accordingly pay the "rightful owners" of the Old Mill property (*i.e.*, the Veljkovics and Dimics) some form of damages, ranging from the "fair market value" of the property to "a percentage of the expected future profits to be earned" from the new hotel. (*See, e.g.*, N.D. Ill. Compl. [Doc. No. 12-1] ¶ 63.)

However, because Bogdan Velkojvic knew that, as an American citizen permanently residing in Serbia, he could not serve as a "foreign plaintiff" in a federal action based on diversity jurisdiction, *see Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 828

---

[2] This decision appears to have been motivated by the fact that the maximum compensation available from the SRA, *i.e.*, 500,000 euros, was far less than the millions of euros that the Old Mill property may be worth. (*See* Compl. ¶ 28 (alleging that, in 2008, Soravia purchased the "usage rights" for the Old Mill property from Prigan for 5,298,515 euros).)

(1989), he and his sister (Katarina) decided to grant Bogdan's son, Plaintiff Alexis

Veljkovic, who was then a U.S. citizen living in Illinois, "all rights in the [Old Mill]

property, including ownership rights," so that Alexis could collect damages and serve as a

plaintiff in this suit. (*See* 2d Pavich Dec. [Doc. No. 40] (containing affidavits from both

Bogdan and Katarina Veljkovic attesting that they transferred their ownership rights to

Alexis "to give him the legal status he needed to pursue this claim," albeit without any

supporting written documentation or assignment).) Moreover, because the Dimic family

also owned a significant stake in the Vracar Cooperative (which, again, was technically the

original owner of the Old Mill property), Bogdan Veljkovic and his U.S. counsel enlisted

Plaintiff Nicholas Dimic, a Canadian citizen currently residing in France, to serve as a

plaintiff, too. (*See* N.D. Ill. Compl. ¶ 4.)[3]

Shortly thereafter, on May 5, 2015, Plaintiffs Veljkovic and Dimic filed a six-count

complaint in the United State District Court for the Northern District of Illinois, asserting

---

[3]     The Court finds two additional aspects of this background noteworthy. First,
although the affidavits of Bogdan and Katarina Veljkovic purport to establish that Alexis
Veljkovic is now the "true owner" of the Veljkovic family interest in the Old Mill
property, it does not appear that Bogdan and Katarina Veljkovic have withdrawn their
claims for restitution before the SRA. Thus, it appears that Bogdan and Katarina
Veljkovic are both claiming ownership in the Old Mill property for purposes of the
Serbian restitution process, but disclaiming ownership in the Old Mill property for
purposes of this tort lawsuit.
        Second, although Nicholas Dimic purports to claim an interest in the Old Mill
property by way of his family's partial ownership of the Vracar Cooperative, Plaintiffs'
complaint never alleges that Tito's government confiscated Nicholas's ancestors' interest
in the Old Mill property, or that either Nicholas (or his family) have pursued any kind of
recompense under the Serbian rehabilitation laws outlined above. Indeed, the complaint
and accompanying exhibits solely discuss Bogdan Veljkovic's efforts to restore *his*
family's name and property rights, not the Dimic's rights.

claims against Radisson Hospitality Inc (then called "Carlson Hotels, Inc.") and Rezidor

Hotel Group AB (collectively "Defendants") for trespass, conversion, civil conspiracy,

unjust enrichment, violations of the Minnesota Deceptive Trade Practices Act ("MDTPA"),

and "constructive trust." Although Defendants jointly moved to dismiss Plaintiffs'

complaint on a number of grounds, Judge Samuel Der-Yeghiayan granted the motion solely

on forum non conveniens. In a relatively perfunctory decision, issued on September 27,

2016, Judge Der-Yeghiayan found that (1) "[a]lthough Plaintiffs may not be able pursue

exactly the same tort claims . . . before the SRA [against Defendants] and the relief afforded

may not be precisely the same, the SRA presents some similar remedies and presents an[]

alternative and adequate forum," and (2) "Plaintiffs' claims can clearly be most efficiently

dealt with in Serbia" because "Serbia is the location which will provide the best access to

the evidence and pertinent witnesses," and because "Serbian law and property will be at

issue in this case." (Sept. 27, 2016 N.D. Ill. Decision [Doc. No. 12-1] at 2.)

Plaintiffs timely appealed this decision to the Seventh Circuit. In so doing, Plaintiffs

primarily argued that (1) "the District Court committed reversible error in finding that the

SRA constituted an available and adequate alternative forum for Plaintiffs' action," and (2)

"the District Court's inadequate analysis of the private interest factors [in the forum non

conveniens analysis], combined with its failure to conduct any analysis into public interest

factors, warrants reversal." (*See* Pls.' Seventh Cir. Br. [Doc. No. 29-1].) Defendants

opposed the appeal under this same two-part framework, *i.e.*, arguing that (1) the District

Court properly found that the SRA constituted an available and adequate alternative forum,

and (2) the District properly weighed and balanced the relevant private interest and public

interest factors. (*See* Defs.' Seventh Cir. Br. [Doc. No. 29-2].) Notably, both briefs focused on whether the United States was an acceptable forum in lieu of the SRA, not whether Illinois was an acceptable forum compared to any other state. (*See, e.g.*, Pls.' Seventh Cir. Br. at 28 (arguing that, although "the District Court broadly declared that Serbia is the location which would provide the best access to such evidence and witnesses . . . much of the relevant evidence and witnesses are located right here in the *United States*") (emphasis added).)

The Seventh Circuit affirmed the District Court's ruling. *See Veljkovic v. Carlson Hotels, Inc.*, 857 F.3d 754 (7th Cir. 2017) ("*Veljkovic I*") (Posner, J., writing). In its opinion, the Seventh Circuit held that Plaintiffs' dispute, which it simply described as a claim that Defendants "knew" that "the [Veljkovic] family was on the brink of recovering the Old Mill," and then "colluded with Prigan Holding to frustrate their efforts," was "more appropriately addressed by the [SRA] than by the federal district court in Chicago." *Id*. at 756. To this end, the Seventh Circuit noted that "no aspect of the plaintiffs' dispute with the defendants ha[d] any relation to Illinois," and that, even though the SRA constituted a "nonjudicial mode[] of dispute resolution," it was an "alternative" and "adequate" forum for purposes of forum non conveniens. *Id*. at 756-57; *see also id*. at 757 (rejecting Plaintiffs' argument that the "SRA's remedies are so meager as to amount to 'no remedy at all'").

### C. Procedural History of This Litigation

The Seventh Circuit's ruling did not end the matter. Rather, approximately one year after the Seventh Circuit's decision, Plaintiffs (represented by the same counsel) regrouped and filed a virtually identical six-count complaint in this District, but this time solely against

Radisson Hospitality Inc. (hereinafter "Radisson"), which, as the Court noted above, is headquartered in Minnesota.[4] Plaintiffs based this strategic decision on an exchange Plaintiffs' lead counsel (Mr. Pavich) had with Judge Posner during oral argument, in which Judge Posner arguably "implied" that Minnesota might be a more suitable location for this suit than Illinois, because at least Radisson is based here. (*See* Seventh Cir. Hr'g Tr. [Doc. No. 29-3] at 20-23[5]; *cf. Veljkovic I*, 857 F.3d at 756 (describing Plaintiffs' dispute as "more appropriately addressed by the [SRA] than by the federal district court *in Chicago*") (emphasis added).)

Within two months of Plaintiffs filing their new complaint, Radisson moved to dismiss. The parties then submitted full briefing on the matter, and the Court entertained oral argument on December 10, 2018. (*See* Def.'s Br. in Support of Mot. to Dismiss [Doc. No. 11] ("Def.'s Br."); Pls.' Br. in Opp. to Def.'s Mot. to Dismiss [Doc. No. 23] ("Pls.' Br."); Defs.' Reply Br. [Doc. No. 28].)

## II.    DISCUSSION

---

[4]    The only other material change between the *Veljkovic I* complaint and the present complaint was that Plaintiff Alexis Veljkovic had moved from Illinois to New York. (*See* Compl. ¶ 3.) The Complaint does not suggest that either he, or Nicholas Dimic, has ever had a connection to the state of Minnesota.

[5]    The gist of the exchange is best captured in the following lines: "Mr. Pavich: Well, we can sue [the Defendants] if they have committed a tort that has injured an Illinois resident even though that tort itself, the act may have taken place outside of Illinois or outside of Minnesota. Judge Posner: It's not just the act taking place outside. You want to sue a Minnesota company for harm to property owned by your clients in Serbia, and you want to sue them in Illinois. Mr. Pavich: That's what we're doing, yes. Judge Posner: I don't get that."

Radisson moves to dismiss Plaintiffs' complaint on the following grounds: (1) res judicata, (2) forum non conveniens, (3) lack of standing, (4) failure to join Prigan Holdings and/or Soravia as a necessary and indispensable parties, (5) failure to state a claim under Serbian law, and (6) failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b). Although federal courts usually address subject matter jurisdiction issues like standing before all else, the Supreme Court has held that "a court need not resolve whether it has authority to adjudicate the cause (subject-matter jurisdiction) . . . if it determines that, in any event, a foreign tribunal is plainly the more suitable arbiter of the merits of the case." *Sinochem Int'l Co., Ltd., v. Malaysia Int'l Shipping Co.*, 549 U.S. 422, 425 (2007).

Because the Court can "plainly" resolve this dispute on forum non conveniens grounds, the Court declines to address Defendants' other arguments in favor of dismissal.

### A.  The Law of Forum Non Conveniens

"Under the doctrine of forum non conveniens, federal district courts have inherent power to resist the imposition of jurisdiction even where authorized by statute if 'the litigation can more appropriately be conducted in a foreign tribunal.'" *De Melo v. Lederle Lab.*, 801 F.2d 1058, 1060 (8th Cir. 1986) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504 (1947)). Although this doctrine "is committed to the sound discretion of the trial court," and will only be reviewed for a "clear abuse of discretion," *Piper Aircraft Corp. v. Reyno*, 454 U.S. 235, 256 (1981), courts must conduct two distinct inquiries in determining whether to dismiss a case on this ground:

*First*, the Court must consider whether "there exists an adequate alternative forum for the litigation." *Id*. at 1061; *accord Piper Aircraft*, 454 U.S. at 254 n.22. This "adequate

alternative forum" may be a non-judicial alternative remedy established to specifically redress a particular set of victims. *See, e.g.*, *Jiali Tang v. Synutra Int'l, Inc.*, 656 F.3d 242, 250-52 (4th Cir. 2011) (affirming forum non conveniens dismissal holding that Chinese government fund created to compensate contaminated infant formula was adequate alternative forum); *Lueck v. Sundstrang Corp*., 236 F.3d 1137, 1143-44 (9th Cir. 2001) (same, in the context of New Zealand's government-run "Accident Compensation System," and noting that "[t]he forum non conveniens analysis does not look to the precise source of the plaintiff's remedy"). Moreover, "the test for adequacy is simply whether a party will have *some* remedy and will not be treated unfairly." *Polanco v. H.B. Fuller Co.*, 941 F. Supp. 1512, 1525 (D. Minn. 1996) (dismissing case on forum non conveniens grounds even though Guatemalan tort remedy was not "equivalent" to Minnesota tort remedy, and plaintiff would struggle to find a local attorney who could represent her).

**Second**, the Court must "balance the private interest factors, which affect the convenience of the litigants, and the public interest factors, which affect the convenience of the forum" and determine whether the "balance of factors" favors litigating the dispute in the District. *De Melo*, 801 F.2d at 1062. The "private interest factors" include the "practical problems that make" discovery and trial "easy, expeditious and inexpensive," such as the location of key witnesses and evidence, and the defendant's ability to implead necessary third parties. *Id*. (citing *Gulf Oil Corp.*, 330 U.S. at 508). The "public interest factors," by contrast, include broader considerations, like "the local interest in having localized controversies decided at home," and "the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law." *Id*. at 1063 (citing *Piper Aircraft*, 454 U.S. at 241

n.6). The Eighth Circuit has stated that "unless the balance [of these factors] is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Reid-Walen v. Hansen*, 933 F.2d 1390, 1394-95 (8th Cir. 1991). However, when "the real parties in interest are foreign," "the presumption in favor of the [plaintiff's] forum choice applie[s] with less than maximum force." *Piper Aircraft*, 454 U.S. at 261; *accord Sinochem*, 549 U.S. at 430. This is so because, "[i]n such a case," it is "more likely that the forum was chosen to take advantage of favorable law or [to] harass the defendant, both of which suggest that dismissal for forum non conveniens is warranted." *De Melo*, 801 F.2d at 1062 n.4.

### B. The Res Judicata Effect of *Veljkovic I* on a Finding of Forum Non Conveniens In This Action

At the outset, the parties dispute whether the *Veljkovic I* courts' forum non conveniens findings are "res judicata" on this Court. Res judicata incorporates the concepts of both issue preclusion and claim preclusion, *see generally Taylor v. Sturgell*, 533 U.S. 880, 892 (2008), and, in a diversity action like this one, is governed by "[t]he law of the forum that rendered the first judgment." *St. Paul Fire & Marine Ins. Co. v. Compaq Comput. Corp.*, 539 F.3d 809, 821 (8th Cir. 2008); *accord Taylor*, 533 U.S. at 891 n.4. Because Plaintiffs originally litigated their claim in Illinois federal court, the court will look to Illinois law here. Under Illinois law a party may assert "issue preclusion," also called "collateral estoppel," "when the issue decided in the prior adjudication is identical with the one presented in the current action, there was a final judgment on the merits in the prior adjudication, and the party against whom estoppel is asserted was a party to, or in privity with a party to, the prior adjudication." *DuPage Forklift Serv., Inc. v. Material Handling*

*Servs., Inc.*, 195 Ill. 2d 71, 77 (Ill. 2001); *see also Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014). This "equitable doctrine" "promotes fairness and judicial economy by preventing the re-litigation of issues that have already been resolved in earlier actions." *DuPage Forklift*, 195 Ill. 2d at 77.

In the forum non conveniens context, courts will generally apply res judicata to a prior court's forum non conveniens determination if the convenience of a *particular* forum vis a vis an "adequate and available" foreign forum was "fully litigated and finally determined," *or* if any differences between that original forum and the new forum are "immaterial." *Compare, e.g.*, *Mizokami Bros. of Arizona, Inc. v. Mobay Chem. Corp.*, 660 F.2d 712 (8th Cir. 1981) (holding that Missouri federal court should *not* have applied res judicata to Arizona federal court's forum non conveniens determination because the Arizona court only asked whether an *Arizona* forum was convenient vis a vis a Mexican forum, and did not consider plaintiff's *Missouri-specific* arguments, such as the availability of particular key witnesses in Missouri, suggesting that a Missouri forum may be more convenient than a Mexican forum) *with China Tire Holdings Ltd. v. Goodyear Tire & Rubber Co.*, 91 F. Supp. 2d 1106, 1110 (N.D. Oh. 2000) (holding that res judicata *did* apply to California federal court's forum non conveniens determination because "[t]he only possible distinction between a forum in California and Ohio [was] that the defendants maintain[ed] their headquarters in Ohio," which was a fact that did not "materially affect the forum non conveniens analysis set forth by the district court in California").

Here, Radisson argues that res judicata bars Plaintiffs from re-litigating their forum non conveniens arguments in their entirety because "the material facts and criteria applied in

*Veljkovic I* are the same here." (Def.'s Reply Br. at 2.) Indeed, Radisson contends, 'the question considered in *Veljkovic I* was whether *Serbia* versus a U.S. court, not simply Illinois, was the appropriate forum." (*Id.* (citing the parties' Seventh Circuit briefing).) By contrast, Plaintiffs argue that "the question of whether Minnesota is an appropriate forum for this litigation was not decided in Chicago," and that "the contacts of the parties and transactions with Minnesota, the availability of witnesses and evidence in Minnesota, and factors affecting the potential burden on the Minnesota District Court were not explored in the Chicago litigation." (Pls.' Br. at 4.)

As a general matter, the Court agrees with Radisson. The Court has thoroughly reviewed the *Veljkovic I* record and is convinced that Plaintiffs' foreign non conveniens arguments in the present litigation are essentially identical to the foreign non conveniens arguments they presented to the Northern District of Illinois and the Seventh Circuit. Indeed, not only do Plaintiffs use the same complaint in both cases, but Plaintiffs' briefing on forum non conveniens before this Court is lifted largely from Plaintiffs' Seventh Circuit briefing. (*Compare, e.g.*, Pls.' Seventh Cir. Br. at 15-32 *with* Pls.' Br. at 7-21.) Although Plaintiffs argue that certain Minnesota-specific convenience issues "were not explored in the Chicago litigation," Plaintiffs do not endeavor to "explore" any Minnesota-specific issues in their briefing before this Court, other than to assert that the outcome of this case should be different because Radisson is headquartered in Minnesota, not Chicago, and that therefore (unnamed) "potential witnesses" and "business plans" must be located here. (*See* Pls.' Br. at 17; *but cf. China Tire Holdings Ltd.*, 91 F. Supp. 2d at 1110 (rejecting argument that res judicata did not apply to a prior federal court's forum non conveniens determination where

"[t]he only possible distinction between a forum in California and Ohio [was] that the defendants maintain[ed] their headquarters in Ohio").)

That said, because the Court is hesitant to use res judicata to wholly preclude Plaintiffs' claims, and because portions of the Seventh Circuit argument transcript and decision (arguably) suggest that aspects of the forum non conveniens analysis may be different were this case filed in Minnesota, the Court will only apply res judicata to part of *Veljkovic I*'s forum non conveniens finding. That is, although the Court will apply res judicata to the Seventh Circuit's finding that the SRA constituted an "adequate and available forum" for Plaintiffs' claims – because that part of the Seventh Circuit decision in no way depended upon whether this case was filed in Illinois or Minnesota – the Court will independently review whether the "private factors" and the "public factors" weigh in favor of resolving Plaintiffs' claims in Minnesota federal court as opposed to in Serbia, before the SRA. *Accord China Tire Holdings*, 91 F. Supp. 2d at 1110 n.3 (independently granting res judicata to prior federal court's determination that "China provided an adequate forum for the plaintiff's suit," because "the plaintiff ha[d] not offered any argument as to how this conclusion [was] in any way affected by supplanting the California forum with an Ohio forum").

## C. The Remaining Forum Non Conveniens Considerations

### 1. *The Private Interest Factors*

Radisson argues that the "private interest factors" weigh in favor of dismissal because "the disputed land and all relevant evidence, witnesses, and information regarding any alleged takings is located in Serbia, not Minnesota." (Def.'s Br. at 11.) For instance,

Radisson contends, the "documents and witnesses necessary to conduct [an] inquiry" into whether Plaintiffs retain good title to the Old Mill property "are in Serbia, not the United States." (*Id.* at 12.) By contrast, Plaintiffs argue that "the key documents" it needs to prove its claims, like the "International Management Agreement between Prigan Holding and Rezidor Hotels APS Denmark," "are in English," and that "potential witnesses will include Defendant Radisson's employees located in Minnesota who can testify to [Radisson's] knowledge of Plaintiffs' rights in the Old Mill property, any due diligence performed by [Radisson], [Radisson's] business plans regarding the hotel, the amounts by which [Radisson] has been unjustly enriched to Plaintiffs' detriment, and a host of other topics relating to Plaintiffs' tort claims." (Pls.' Br. at 17.)

The Court agrees with Radisson. The documents attached to Plaintiffs' complaint and opposition motion plainly show that the critical evidence in this case would be found in Europe, not Minnesota. (*See generally supra* at 6-7.) Indeed, as best the Court can tell, every important individual involved in the development of the Belgrade Radisson Blu hotel works in either Serbia, Austria, Germany, or Denmark. (*Id.*; *see also Piper Aircraft*, 454 U.S. at 258 (fact that "many crucial witnesses are located beyond the reach of compulsory process, and thus are difficult to identify or interview" weighed in favor of dismissal); *Polanco*, 941 F. Supp. at 1528 (same).) By contrast, Plaintiffs only offer speculation that "Radisson's employees in Minnesota" were in charge of the Belgrade Radisson Blu hotel, or were responsible for conducting "due diligence" into the ownership of the Old Mill property. (Pls.' Br. at 17.) Notably, too, Plaintiffs have not challenged the declaration of Mr. Judd Wadholm (Radisson's Vice President of Owner Relations and Retention), in which

Mr. Wadholm attested that "Radisson Hospitality, Inc. is not the owner, operator, or developer of the Radisson Blu Hotel [in Belgrade]," and that "Radisson Hospitality, Inc.'s mere involvement with the hotel is as a master licensor of the Radisson brand name." (Wadholm Dec. ¶ 4.) All told, on this record, the Court concludes that gathering evidence and subpoenaing witnesses would be far from "easy, expeditious and inexpensive." *De Melo*, 801 F.2d at 1062; *accord* Sept. 27, 2016 N.D. Ill. Decision at 2 (finding that "Serbia is the location which will provide the best access to the evidence and pertinent witnesses"). Moreover, given that Plaintiffs' case is premised on an alleged "conspiracy" between Radisson and numerous European entities, all of which are likely outside this Court's jurisdiction, Radisson would be prejudiced by an inability to implead one or more of those entities. *See De Melo*, 801 F.2d at 1063 (noting that a "private interest [factor] strongly favoring dismissal is [defendant's] inability to implead potential third-party defendants in domestic litigation," even though defendant could (in theory) "maintain a suit for indemnity or contribution against potential third-party defendants" in a foreign country); *Polanco*, 941 F. Supp. at 1528 (same).[6]

For these reasons, the Court finds that "private interests" would be best served by resolving this case through the SRA, rather than in Minnesota federal court.

## 2. *The Public Interest Factors*

---

[6] Indeed, Radisson also moved to dismiss Plaintiffs' complaint under Fed. R. Civ. P. 12(b)(7) for failure to join either Prigan or Soravia, the alleged land owners/"co-conspirators," as "necessary and indispensable parties." (*See* Def.'s Br. at 19-23.)

Radisson also argues that the "public interest factors" weigh in favor of dismissal. Not only would this case require this Court "to learn and apply foreign law," Radisson contends, but, "[i]n light of the emphasis on localized controversies being resolved locally," "Serbia has a 'paramount' and unique interest in adjudicating Plaintiffs' claims." (Def.'s Br. at 13.) Moreover, Radisson points out, "neither Plaintiff has any connection to Minnesota," and "none of the underlying facts in this case relate to the United States in any way." (*Id*. at 13-14.) By contrast, Plaintiffs argue that the Serbian legal system does not have "an interest in hosting this litigation between a U.S. citizen and a U.S. corporation," particularly because "Minnesota law will dominate any legal analyses in this case." (Pls.' Br. at 20.) Plaintiffs also cite to various reports describing the "pervasive, systemic corruption" in the Serbian legal system. (*Id*. at 19.)

The Court agrees with Radisson on this issue, too. Most importantly, although this litigation is technically "between a U.S. citizen and a U.S. corporation" (Pls.' Br. at 20), Plaintiffs' case centers largely around questions of *Serbian*, not Minnesota, law. *Accord* Sept. 27, 2016 N.D. Ill. Decision at 2 ("Serbian law and property will be at issue in this case."). For instance, a critical question in this litigation is whether Plaintiffs have a legal (as opposed to moral) claim to the Old Mill property. This question matters because neither this Court nor a Minnesota jury could find that Radisson "trespassed" or "conspired to trespass" on Plaintiffs' land, or otherwise committed tortious acts, unless Plaintiffs prove that they *actually own* the Old Mill property (or could have owned the property but-for Radisson's actions). Because the 2009 Serbian Court ruling plainly does not resolve this question (*see supra* at 4-5), and because Plaintiffs point to no other evidence in support of their ownership

rights, the Court (and potentially the jury) would have to examine (a) Serbian property law, (b) Serbian business organizations law (because of the involvement of the Vracar Cooperative), and (c) Serbian restitution law, in order to resolve this threshold question of ownership. Neither this Court, nor the citizens of Minnesota, should be burdened with such a task, especially when there is no indication that a Minnesota corporation was materially involved with the tortious acts alleged by Plaintiffs. *See Piper Aircraft*, 454 U.S. at 251 (holding that, because "[t]he doctrine of forum non conveniens . . . is designed in part to help courts avoid conducting complex exercises in comparative law," "the public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself'") (quoting *Gulf Oil Corp.*, 330 U.S. at 509).

Moreover, hosting this litigation in Minnesota would risk unduly interfering with the Serbian government's ability to resolve a dispute that is "localized" not just in a legal sense, but in a political sense, too. *See Gulf Oil Corp.*, 330 U.S. at 509 ("There is a local interest in having localized controversies decided at home."). In other words, this dispute is not simply a "run of the mill" international commercial property dispute that would just happen to require the application of Serbian law; rather, this dispute is rooted in historic wrongs committed by Serbia's own government, which Serbia's leaders are now endeavoring to make amends for through specific, targeted legislation. (*See supra* at 4-5.) In this context, the Court is especially hesitant to exercise jurisdiction alongside the SRA. (*See also* Nikolic Dec. ¶¶ 6, 14 (stating that the Serbian government created the SRA as "the sole remedy" for claimants seeking restitution for confiscated land); Kovacevic Dec. ¶¶ 14-15 (same).) As the Supreme Court once noted in a somewhat analogous context, where a plaintiff's "claims

arise from events of historical and political significance for [a foreign state] and its people,"
"[t]here is a comity interest in allowing a foreign state to use its own courts for a dispute if it
has a right to do so." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 866 (2008).
Likewise here, the Court finds that "comity" is best served by having the SRA, not the
Minnesota federal court, resolve this "localized controversy." *Gulf Oil Corp.*, 330 U.S. at
509; *see also RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2100 (2016) ("It
is a basic premise of our legal system that, in general, "United States law governs
domestically but does not rule the world.'") (quoting *Microsoft Corp. v. AT&T Corp.*, 550
U.S. 437, 454 (2007)).

Finally, general allegations of "corruption" in the Serbian legal system do not
significantly weigh against sending this dispute to the SRA. *See Polanco*, 941 F. Supp. at
1527 (rejecting argument that Guatemalan legal system was inadequate alternative forum
because the Guatemalan courts were allegedly "inefficient and corrupt," and noting that
"[t]he Court declines plaintiff's invitation to categorically denigrate" a foreign legal
system); *see also Niv. v. Hilton Hotels Corp.*, 710 F. Supp. 2d 328, 337-38 (S.D.N.Y. 2008)
(rejecting argument that Egyptian legal system was inadequate alternative forum based on
"corruption," and gathering substantial case law in support of the contention that "[c]ourts
must be cautious before finding incompetence or corruption by other nations' judicial
systems"). This is especially so because the reports appended to Plaintiffs' opposition
motion do not specifically detail any "corruption" within the SRA itself. *Accord Veljkovic I*,
857 F.3d at 756 ("[N]o reason has been given to us to doubt the adequacy of the SRA.").

And, of course, Plaintiffs (or, at least, two of Plaintiff Veljkovic's relatives) have signaled their comfort with the SRA by filing "18 claims for restitution" there. (*Supra* at 7.)

For these reasons, the Court finds that "public interests" would be best served by resolving this case through the SRA, rather than in Minnesota federal court.

* * * *

When viewed together, the Court finds that the "private interests" and "public interests" at stake weigh "strongly in favor of" resolving this case through the SRA. *Reid-Walen*, 933 F.2d at 1394-95.

Moreover, to the extent that Plaintiffs' choice of forum weighs in favor of maintaining this litigation in Minnesota, the Court also finds that the usual "presumption in favor of a [plaintiff's] forum choice applie[s] with less than maximum force" here. *Piper Aircraft*, 454 U.S. at 261. That is so because (a) Plaintiff Dimic is a Canadian citizen residing in France, and (b) although Plaintiff Veljkovic is a U.S. citizen residing in America (albeit without any connection to Minnesota), the "real party in interest" in this lawsuit appears to be Bogdan Veljkovic, who, as noted above, is a U.S. citizen who has chosen to reside in Serbia. *See De Melo*, 801 F.2d at 1062 n.4. Indeed, as Plaintiffs' counsel emphasized at the motion hearing, "the only reason" Alexis, rather than Bogdan, is the "plaintiff in this case" is because Bogdan is "not residing in the United States," and therefore cannot bring a lawsuit premised on diversity jurisdiction. (Dec. 10, 2018 Hr'g Tr. [Doc. No. 35] at 53.) This stratagem further demonstrates why Serbia, not Minnesota, is the proper place to resolve this dispute. *Compare with Reid-Walen*, 933 F.2d at 1935 (finding that U.S. citizen's choice of a U.S. forum *was* entitled to deference because,

although her lawsuit was premised on a tort that occurred in Jamaica, the U.S. citizen was only in Jamaica because she was "enjoying a personal vacation of a few days' duration" there).

For all of these reasons, Plaintiffs' complaint must be dismissed on the ground of forum non conveniens.[7]

## III. ORDER

---

[7]     As a final matter, the Court notes that, a few weeks after oral argument, the D.C. Circuit Court of Appeals released a forum non conveniens decision involving a class of Holocaust survivors that are suing the Hungarian state-owned railway over property (largely personal) that was stolen from the survivors at the outset of the Holocaust. *See Simon v. Republic of Hungary*, 911 F.3d 1172 (D.C. Cir. Dec. 28, 2018).

In that case, the D.C. Circuit reversed, by a 2-1 vote, the District Court's finding of forum non conveniens. Although Plaintiffs' counsel argued at the motion hearing that these kinds of "Holocaust property theft" claims are analogous to the claims at issue here (*see* Hr'g Tr. at 47-49), the Court finds that the D.C. Circuit's decision amply demonstrates why that is not the case. For one, the Circuit found that "international common law," *not* Hungarian property law, would apply to the survivors' claims. *Simon*, 911 F.3d at 1189. Moreover, in finding that the United States had a "strong" public interest in resolving claims related to Hungary's role in the Holocaust (even when brought by a class that included both U.S. and foreign plaintiffs), the Circuit relied heavily on a statement of interest by the United States government asserting that (a) the Hungarian government had not developed a recognized scheme to compensate survivors of the Holocaust for its role in perpetrating that atrocity, unlike virtually every other European government involved, and (b) the United States had a uniquely "strong and longstanding interest in ensuring the timely remediation of the claims of Holocaust survivors." *Id*. at 1187-90.

Here, by contrast, not only do sensitive questions of Serbian real property law permeate Plaintiffs' lawsuit, but the Serbian government *has* created a compensation scheme to deal with the (far less severe) crimes inflicted on Plaintiffs' ancestors. Further, there is no indication, from the U.S. government or otherwise, that the United States has a "strong and longstanding interest" in resolving claims rooted in the Serbian government's confiscation of private land in the 1940s. *Id*.

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss [Doc. No. 9] is **GRANTED**. Plaintiffs' Complaint [Doc. No. 1] is **DISMISSED WITHOUT PREJUDICE**.

Like the *Veljkovic I* courts, though, the Court grants this dismissal on the condition that Radisson abide by its promise to consent to the jurisdiction of the SRA, if called upon to participate in those proceedings in any way, and to not contest the ultimate rulings from the SRA concerning the Old Mill property. (*See* Defs.' Br., Ex. 4 [Doc. No. 12-1] ¶ 2 (Sept. 14, 2016 filing from Northern District of Illinois, in which Defendants promised to consent to the jurisdiction of the SRA); *accord* Defs.' Br. at 11 (repeating this promise for purposes of this litigation); Hr'g Tr. at 13-15 (same).)

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:  March 26, 2019                                  _/s/ Susan Richard Nelson____
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge